STATE, ex rel COOK, et al, Respondents, v. RICHARDS, Appellant.

(245 N. W. 901.)

(File No. 7399. Opinion filed December 20, 1932.)

*Chambers Kellar,* of Lead, for Appellant.
*Francis J. Parker,* of Deadwood, for Respondents.
*John T. Heffron,* of Deadwood, amicus curiæ.

CAMPBELL, P. J. Prior to 1932, Lawrence county, S. D., was divided into five commissioner districts; the first embracing the city of Deadwood and some outside territory, the second the city of Spearfish and some outside territory, the third a portion of the city of Lead with some outside territory, the fourth a portion of the city of Lead with some outside territory, and the fifth the towns of Nemo and Terry and some adjacent outside territory. At the regular meeting of the county commissioners in January, 1932, said commissioners undertook to redistrict the county pursuant to the requirements of section 5864, R. C. 1919, which reads as follows: "It shall be the duty of the board of county commissioners, at its regular meeting in January, 1920, and every four years thereafter, after giving notice by publication for three weeks in the official papers of the county, to change the boundaries of the commissioner districts whenever such change shall be necessary in order that each district shall be as regular and compact in form as is practicable, and it shall so divide and redistrict its county that each district may contain as near as may be within one hundred of the same number of votes, as shown by the official returns of the votes cast at the last election held prior to the date of the meeting mentioned herein at which election state and county officials were elected; providing, in such redistricting, no voting precinct shall be divided; provided, also that no incorporated city shall be divided into more than two commissioner districts."

Certain taxpayers of the county suggested to the county commissioners a proposed plan of redistricting as follows: The first

district to consist of a portion of the city of Lead; the second district of the remander of the city of Lead; the third district a portion of the city of Deadwood with certain adjacent territory; the fourth district the city of Spearfish and certain surrounding territory; and the fifth district the remainder of the city of Deadwood and certain adjacent territory. On that basis the votes of the respective districts proposed by the official returns at the last previous election would have been for the first district, 813; for the second district, 873; for the third district, 827; for the fourth district, 802; and for the fifth district, 792. The board of county commissioners failed to approve of said suggestion, however, and presently unanimously adopted a resolution for redistricting in the following form:

"The matter of redistricting Lawrence County, South Dakota into commissioner districts, having come on before the Board of Commissioners of Lawrence County, on due notice as by law required, upon the 12th day of January, 1932, and certain parties requesting a change in the boundaries of said district having appeared before said Board, and having been fully heard and the Board being full advised in the matter of the extent of the territory and the number of residents in each of said Commissioner districts now existing, on motion of Mr. Curran, seconded by Mr. Dixon, it is by the said Board of Commissioners, resolved

"That the boundaries of the commissioner districts in Lawrence County, South Dakota, be established, so as to include in each of the several districts territory as follows:

District No. 1:
    Central City ..................... 99
    Deadwood,
        1st Ward ................... 98
        2nd Ward .................. 167
        3rd Ward .................. 236
        4th Ward .................. 333
    Mountain Ranch ................. 12   945

District No. 2:
    Hathaway ....................... 20
    Crook City ..................... 11
    Centennial ..................... 29

Crow Creek ....................... 42

Reeds ........................... 55

Spearfish ........................ 577

Spring Creek .................... 15

School District No. 57 ........... 25

St. Onge ....................... 78

Upper False Bottom .............. 23

Whitewood ..................... 97    972

District No. 3:

Lead,

    1st Ward ................... 338

    2nd Ward ................... 197

    3A Ward ................... 278

    3B Ward ................... 173    986

District No. 4:

Lead,

    4th Ward ................... 162

    5th Ward ................... 274

    6th Ward ................... 264

Terraville ...................... 53

Golden Gate .................... 16    769

District No. 5:

Terry .......................... 28

Cheyenne ...................... 9

Bear Gulch ..................... 31

Elkhorn ........................ 14

Englewood ..................... 19

Galena ........................ 17

Hanna ......................... 14

Mountain Meadow ............... 32

Nemo .......................... 149

Portland ....................... 30

Roubaix ....................... 39

Savoy ......................... 4

Underwood ..................... 17

Pluma ......................... 22    425

Total ................... 4,097

"In the selection of the above districts, the Board has given consideration to the question of administration and have chosen the districts with a view of giving proper representation to the various citizens of the County and to the Agricultural, Mining, Timbering and Commercial sections thereof."

Thereafter some seventeen taxpayers of said county residing in Spearfish made written demand upon the state's attorney of said county to take an appeal from the action of the board of county commissioners with reference to redistricting; such demand being made under that portion of section 5886, R. C. 1919, reading as follows: " * * * Provided, that any states attorney, upon written demand of at least seven taxpayers of the county, shall take an appeal from any action of the board of county commissioners, when such action relates to the interests or affairs of the county at large or any portion thereof, in the name of the county, when he deems it to the interest of the county so to do; and in such case no bond shall be required or given, and upon serving the notice provided for in the following section the county auditor shall proceed the same as if a bond had been filed, and his fees for making the transcript shall be paid as other claims by the county."

The state's attorney, not deeming it to the interest of the county to take the appeal demanded by said taxpayers, notified them of his unwillingness to do so by the following letter addressed to them and their attorney:

"Gentlemen:

"I have carefully examined the petition requesting an appeal from the action of the Board of Commissioners changing the boundaries of the commissioner districts in Lawrence County, as contained in the resolution adopted on January 13, 1932, and examined the law and facts relative thereto.

"The law provides that the State's attorney shall take an appeal upon the proper petition 'when he deems it to the interest of the County so to do.' The power thereby vested in the States Attorney is not a personal right to decide whatever way he may wish, but is quasi judicial and must be exercised in the light of and governed by the law and facts of the case.

"The law provides (section 5864) that when changing boundaries of commissioner districts, with certain exceptions not ma-

terial here, two things are to be considered by the Commissioners. First, each district shall be as regular and compact in form as it is practicable; and second, each district shall contain as near as may be, within one hundred of the same number of votes. Under this statute our Supreme Court has held ('Codington County v. Board of Comm., 199 N. W. 594) 'that if an incorporated city should contain one-fifth the population it should constitute one district and have one commissioner. If such city should contain two-fifths of the population, it should comprise two districts and have two commissioners.' This rule was quoted with approval in a later case in the Supreme Court (State v. Scott, 227 N. W. 972 [572]) and as a result of that decision the City of Sturgis, without other or additional territory, was established as one commissioner district and given one commissioner. Under the rule of law thus established the City of Lead is entitled to two commissioners and the City of Deadwood to one commissioner, Lead having more than two-fifths of the voting population and Deadwood having more than one-fifth the voting population. This leaves the balance of the population and territory in Lawrence County, including the town of Spearfish which is not affected by the above rule, it having considerably less than one-fifth the population of the county, to be divided as equitably as possible with due consideration for the compactness and regularity of districts and the number of votes therein contained.

"Large areas of this remaining territory are separated by impassable mountainous country. Different interests and needs exist; the chief industries in the southerly territory being mining and timbering, and the chief industries in the northerly territory being agricultural. It is practically impossible to divide this territory so that the districts will be compact and regular in form and yet have within one hundred of the same number of votes. Also it seems at this time that the territory to the south has much greater prospect of a considerable increase in population in the near future than that in the northerly part of the county.

"This being the situation, I do not believe the Board of Commissioners abused the discretion vested in them to district the county as they have, but that they acted under all the circumstances for the best interests of the county, and that it is not to the interest of the county to appeal from the decision.

"Yours respectfully,
"Clinton G. Richards."

Upon this refusal of the state's attorney to take such appeal, the demanding taxpayers instituted the present proceeding in the court below seeking a writ of mandamus to compel the state's attorney to take the appeal. The state's attorney moved to quash the alternative writ, which motion was denied, and thereupon the state's attorney interposed his answer as follows:

"First. That he did not take an appeal from the decision of the Board of County Commissioners of Lawrence County, South Dakota, of date January 13, 1932, redistricting the Commissioners Districts in said county on demand of certain tax payers as herein appears because he did not at that time and does not at the present time deem it to the interest of the county so to do.

"Second. That by said decision said county was divided into five Commissioners Districts as indicated on a map of said county attached hereto and made a part hereof and marked Exhibit 'A.' That the boundaries of said districts are approximately indicated by red lines dividing said map of said county into five different parts and that the figure one (1) indicates Commissioner District Number One, the figure two (2) indicates Commissioner District Number Two, the figure three (3) indicates Commissioner District Number Three, the figure four (4) indicates Commissioner District Number Four, and the figure five (5) indicates Commissioner District Number Five; that said map also indicates the location and kinds of highways existing in said county and the location of towns and cities in said County as shown thereon and various other matters as more fully appears thereon.

"Third. That all of said County except a strip along the northerly part thereof about seven miles in width at the West boundary of said County and about twelve miles in width at the East boundary of said County, lies in what is known as the Black Hills of South Dakota, and is a rough and mountainous country covered for the most part with pine and other timber; that the roads in said mountainous part of said county are not laid out with reference to section lines but follow the course of streams and natural divides existing in said territory and that it is very difficult,

if not impossible, to pass from one part of said mountainous part of said county to another part thereof except by following said highways.

"Fourth. That said strip along the northerly part of said county described in Paragraph Three herein constitutes roughly the second commissioner district under said decision and that in said part of the county the principal industries are agriculture and stock raising. That the principal industries in the rest of said county are mining and timbering; that there are many open and active mines in said part of said county, representing a large portion of the total active industries of the entire county; that the timbering industry, both as a part of the mining industry and for commercial purposes is carried on quite extensively in various parts of said territory; that more than eighty per cent of the total valuation of taxable property in said county lies in said mountainous part of said county.

"That in said territory there has been a considerable increase in population since the last general election and prospects are that there will be a greater increase within a comparatively short time on account of the revived interest in the mining industry.

"Fifth. That as shown by the returns of votes cast at the last general election more than one-fifth of the entire voting population of the County resides in the City of Deadwood, South Dakota, and that more than two-fifths of the entire voting population resides in the City of Lead, South Dakota; that said cities are located in the central part of said County and are a distance of about three miles apart.

"Sixth. That having due regard for the topographical conditions of said County and the highways therein and the location of the centers of population of said County, all as hereinbefore set out, said decision establishing said five commissioners districts, divides the County as equitably and fairly and so as to facilitate the accommodation of all the interests of all the people and industries of said County as may be done under the law providing therefor.

"Seventh. That the proposed division set up in the application of relators herein, would divide the City of Deadwood and put part of said city into the fifth commissioner district and part into the third commissioner district, with population so divided

in each of said districts that the city of Deadwood could be entirely deprived of a commissioner, and that such division would be unfair to the city of Deadwood, and contrary to the law governing districting of said commissioners districts, and that the same would be opposed by the City of Deadwood and residents thereof.

"Eighth. This defendant further alleges and says that by the decision of the Board of Commissioners, the voting precinct of Mountain Ranch and of Central City was included in the first commissioner district, which includes the City of Deadwood, and that the Terraville district and the Golden Gate district were included in the fourth commissioner district, for the reasons that on account of the highways in said county and the location of said precincts, they are more accessible to the commissioners in said districts than they are to commissioners in any other district, and their interests can be better served by those commissioners than by any other and that there is not sufficient population in any of said precincts to in any way deprive the City of Deadwood in said district Number One or the part of Lead in said district Number Four of proper representation and a commissioner as by law provided.

"Ninth. That upon the hearing held upon the question of dividing the County into said commissioners districts, residents from Commissioner District Number Two petitioned the commissioners herein protesting against any change in the boundaries of said district; that true copies of said petitions are attached hereto and made a part hereof and marked Exhibits 'B' and 'C.' That upon said hearing a large number of people from said district were present in person for the purpose of protesting against any such change.

"Tenth. That Commissioner District Number Five can not be enlarged so as to contain a larger voting population without disregarding the question of compactness and regularity. That said district now contains more than sixty per cent of the total territory in the entire County.

"Eleventh. For a further answer this defendant alleges and says that no method is provided for taking an appeal as directed in said Alternative Writ under the facts and circumstances existing in this case; that the law provides that written notice shall be

served 'upon the person or persons affected by the decision of the Board when the appeal is taken by the State's Attorney.' That the relators herein allege that they and every citizen and taxpayer of the County of Lawrence are vitally interested in the decision of said Board redistricting said County and they are affected by said decision, and that it is practically impossible to serve written notice on all the citizens of Lawrence County, and that there is no other method provided by law for taking said appeal and none is pointed out or specified in said Writ

"Wherefore, defendant prays, for all the reasons heretofore set out, that the Alternative Writ of Mandamus be dismissed and these proceedings terminated."

To this answer the petitioners demurred upon the ground that the same did not state facts sufficient to constitute a defense, which demurrer was sustained, and, the defendant state's attorney not answering over, judgment was subsequently entered awarding the peremptory writ, from which judgment the defendant has now appealed.

■ ■ The appeal statute, section 5886, R. C. 1919, above quoted, affirmatively vests some degree of discretion in the state's attorney by virtue of the provision that he shall take the appeal upon the statutory demand "when he deems it to the interest of the county so to do." A question first arises as to whether or not the discretion thus vested in the state's attorney is, under any circumstances or in any case, conceivably subject to judicial control by mandamus. This question we think must be answered in the affirmative. It is, of course, the broad general rule that, where an officer vested with discretion has exercised such discretion, his action, right or wrong, will not be controlled by mandamus and the discretion of the court will not be substituted for that of the officer. To this rule, however, there is a well-recognized execption, which is easily susceptible of statement and frequently difficult of application. The exception is broadly outlined in 38 C. J. p. 598, as follows: "While the contrary view has been upheld, the great weight of authority is to the effect that an exception to the general rule that discretionary acts will not be reviewed or controlled exists when the discretion has been abused. The discretion must be exercised under the established rules of law, and it may be said to be

abused within the foregoing rule where the action complained of has been arbitrary or capricious, or based on personal, selfish, or fraudulent motives, or on false information, or on a total lack of ● authority to act, or where it amounts to an evasion of a positive duty, or there has been a refusal to consider pertinent evidence, hear the parties when so required, or to entertain any proper question concerning the exercise of the discretion, or where the exercise of the discretion is in a manner entirely futile and known by the officer to be so and there are other methods which if adopted would be effective." Cf. also, State ex rel Goodhope v. Leyse (1932) — S. D. —, 244 N. W. 529; Farmers' Loan & Trust Bank v. Hirning (1919) 42 S. D. 52, 172 N. W. 931.

Our present inquiry narrows to this: Was there an abuse of discretion by appellant upon the facts of the instant case, and, if so, was it of such nature or extent as to justify the interference of the circuit court by mandamus?

The appeal statute in question has been previously considered by this court in Lyman County v. Board of Com'rs (1901) 14 S. D. 341, 85 N. W. 597, and Barnum v. Ewing (1928) 53 S. D. 47, 220 N. W. 135, 138, and in the latter case we said: "* * * Undoubtedly the state's attorney is vested with some discretion by our statute. This, of course, means a legal discretion, and he cannot act arbitrarily in the mtater. If the state's attorney abuses such discretion, doubtless the demanding taxpayers have their remedy. * * *"

It is urged by respondents that we are here presented with such a case of abuse of discretion as was foreshadowed as a possibility by the language above quoted, and that the proper remedy of the demanding taxpayers must be mandamus.

■ ■ The right of appeal from any action of the county commissioners is entirely statutory. Barnum v. Ewing, supra. It has been variously established in different states. Under some statutes the right of appeal appears to exist only with reference to the action of the county commissioners in allowing or disallowing claims against the county. An individual whose claim is rejected seems almost universally to be given a right of appeal. With reference to the matter of appeal when the claim is allowed, the statutes appear to run from one extreme to the other. In Ne-

braska (section 866, Comp. Stat. 1922) and in Arkansas (Echols & Helton v. Lincoln County [1922] 154 Ark. 142, 241 S. W. 881) any taxpayer may appeal from such allowance. In Minnesota the county attorney may always appeal, and any seven taxpayers may appeal in their own names. Section 646, Mason's Stat. 1927. In Utah there is no authority of law (unless enacted subsequently to 1925) for any appeal from the action of the county board in allowing a claim. Bailey v. Van Dyke [1925] 66 Utah, 184, 240 P. 454. Our own statute is broad in its terms, and allows appeal from "all decisions of the board of county commissioners upon matters properly before it," which has been construed by this court to mean all decisions wherein the county commissioners exercised judicial or quasi judicial power. Codington County v. Board of Com'rs (1927) 51 S. D. 131, 212 N. W. 626. And it has been held by this court that the determination of the county commissioners with reference to the matter of redistricting the county pursuant to section 5864, R. C. 1919, involves the exercise of judicial or quasi judicial powers. Barnum v. Ewing, supra; County of Codington v. Board of County Com'rs (1924) 47 S. D. 520, 199 N. W. 594. Coming to the portion of our statute with reference to appeal by the state's attorney upon demand of taxpayers, we have found little assistance from parallel statutes in other states. North Dakota has the same statute as our own (section 3298, Comp. Laws 1913), derived, of course, from the same source (section 30, c. 27, Laws Dakota 1874-75, as amended by chapter 5, Laws Dakota 1883). Oklahoma also adopted our statute. Section 1833, Stat. Okl. Territory 1890, section 1640, Rev. Laws Okl. 1910; and see Smith v. Board (1910) 26 Okl. 819, 110 P. 669. The Oklahoma statute was amended by chapter 117, Laws 1915, to require that the appeal be demanded by "fifteen freeholders" in lieu of "seven taxpayers." Under the Virginia law, the county attorney can appeal of his own motion from any allowance of claim which he deems improper or unjust, and may be required to appeal by any six freeholders of the county. Section 2759, Va. Code 1930. We have failed to find cases under these or similar statutes discussing the precise scope and extent of the discretion thereby vested in the state's attorney, although the Oklahoma court suggested in Clark v. Warner (1922) 85 Okl. 153, 204 P. 929, 935 (as did our own court in Barnum v. Ewing, supra), the possibility of control

of abuse of such discretion in the following language: "The only authority granted to such freeholders is to petition the county attorney to appeal in the name of the county and this the county attorney has not seen fit to do. If the county attorney arbitrarily and without cause refused to perform this duty, such petitioners may have a remedy to compel performance, but that question is not before us, and therefore we are not expressing any opinion upon it."

It is apparent that the Legislature was free to do whatever it deemed advisable at the time of the enactment of this appeal statute. It was under no duty to provide for any appeal whatever. It might have provided for appeal by any taxpayer. It might have provided for appeal by the state's attorney whenever he deemed it proper. Instead. however, it limited the taking of these appeals upon three conditions precedent. The statute requires that the action of the commissioners from which appeal is sought must relate to the interests or affairs of the county at large or a portion thereof; second, there must be a written demand of at least seven taxpayers; and, third, the state's attorney must deem it to the interests of the couny to appeal. The Legislature appears to have been unwilling to leave the matter entirely in the hands of every taxpayer or of any seven taxpayers, or entirely in the discretion of the state's attorney, and it is easy to see some wisdom in its requirements. A sound public policy requires the exercise of some substantial discretion in order to prevent continual and unnecessary interference with the conduct of public affairs upon technical and picayunish objections. If every taxpayer possessed the unlimited privilege of constantly asserting the public right and interest in his own person and seeking judicial determination thereof at public expense, governmental processes might be most seriously handicapped. The state's attorney is a constitutional officer and the law officer of the county, and it seems a proper and reasonable provision that he should be vested with some discretion in determining whether or not the public interest requires an appeal. Conceivably an erroneous exercise of such discretion on his party may work some hardship or injustice in a given case, but in many cases so also might an absolute and unrestricted duty of appeal upon the mere demand of one or several taxpayers. It is for the Legislature to weigh these practical difficulties and strike a balance between

them as best it can, and so it has done in the statute under consideration. The particular language of this statute which vests discretion in the state's attorney is worthy of some attention. The state's attorney is not required to appeal upon the demand of taxpayers whenever he deems the questioned decision erroneous or technically wrong, but when he deems it to the best interests of the county to take the appeal. It is manifest that he is intentionally vested with a considerable degree of discretion. We come now to consider whether there here appears an abuse of that discretion in the sense of a use or misuse thereof so improper as to justify judicial interference by mandamus, and solution of that question involves in turn some examination of the commissioners' decision from which appeal is sought.

■ ■ It is perfectly plain that the question of how a county shall be divided into commissioner districts is primarily a political and administrative matter for the legislative branch of government rather than the judicial, just as is the division of the state into counties or into legislative districts. The Legislature, however, in instrusting the division of counties to the boards of county commissioners, has seen fit to provide by section 5864, R. C. 1919, that the commissioners in establishing such districts observe certain general requirements. Each district shall be as regular and compact in form as is practicable. Each district shall contain as nearly as may be within 100 of the same number of votes as indicated by the returns of the last election. No voting precinct shall be divided into two commissioner districts, and no incorporated city shall be divided into more than two commissioner districts. The determinations of fact which the county commissioners must make in order to comply with the statute involve the exercise of quasi judicial power, and the interpretation of the statute and whether the commissioners have complied therewith are judicial questions. To the extent of those matters the action of the county commissioners may be reviewed by the courts upon proper appeal. County of Codington v. Board of County Com'rs (1924) 47 S. D. 520, 199 N. W. 594, 595. Otherwise the matter rests in the administrative discretion of the commissioners. It is to be noted also that the limitations imposed by the statute are not fixed and inelastic, but the statute takes practicability into consideration.

■ The objections urged by respondents to the action of the county commissioners, as we read the record in this case, are as follows:

First, it appears that Maitland voting precinct, which cast 10 votes at the last general election, was entirely omitted in the redistricting. That point does not appear to have been urged to or relied upon by the trial court, but appears rather as a subsequent discovery. So far as that particular matter is concerned, it seems from the record to be merely a clerical error or inadvertence in the redistricting resolution which could probably be corrected by the county board by nunc pro tunc order without necessity for appeal.

Second, respondents point out that district No. 1 was created by including certain territory with the city of Deadwood and district No. 4 by including certain adjacent territory with a part of the city of Lead. Respondents point out that the city of Lead contains more than two-fifths of all votes in the county and the city of Deadwood more than one-fifth of all votes in the county, and therefore, that the city of Lead was entitled to be divided into two commissioner districts without the inclusion of any outside territory and the city of Deadwood was entitled to be established as one commissioner district without the inclusion of any outside territory, citing County of Codington v. Board of County Com'rs, supra, wherein this court said: "Upon an examination of section 5864 its chief object seems to be to require that the commissioner districts be compact and regular in form, and should contain about the same number of inhabitants. Under this rule, if an incorporated city should contain one-fifth of the population, it should constitute one district and have one commissioner. If such city should contain two-fifths of the population, it should comprise two districts and have two commissioners. If it contains three-fifths of the population, it should comprise three districts and be entitled to three commissioners and so on until a single city might have four of the commissioners, or even possibly the whole five. But to prevent such a situation the section contains the provision 'that no incorporated city shall be divided into more than two commissioner districts.' This, however, is the only limitation upon the above rule, and from this it follows that the city of Watertown, containing more than two-fifths of the population of the county, should be

divided into two commissioner districts and have two commissioners"—and State ex rel Peterson v. Scott (1929) 56 S. D. 144, 227 N. W. 572, 573, where we said: "The application also alleges facts sufficient on their face to show that at each of those times the board of commissioners should have established the city of Sturgis without other additional territory as one commissioner district in said county under the rule laid down by this court in Codington County v. County Commissioners 47 S. D. 520, 199 N. W. 594."

The appeal in the Codington County Case was by taxpayers of Watertown and in the other case by taxpayers of Sturgis, and in those cases this court was recognizing a right of the taxpayers of those cities which they were asserting, namely, their right to have their cities constituted as either one or two commissioner districts, if they contained one-fifth or two-fifths of the county vote, without the addition of adjacent territory. In the instant case no taxpayers, either of the city of Lead or of the city of Deadwood, are making objection. We did not intend to say in the two cases last above referred to that the inclusion of additional territory with a city under such circumstances would always and in every event impair the validity of the entire redistricting, or that the point could be urged upon the court by other taxpayers, the residents of the cities themselves making no objection.

Third, respondents urge the discrepancy in voting population between the various districts established by the commissioners; the vote in districts 1 to 5 being, respectively, 945, 972, 986, 769, and 425. On that point also the statute gives the county commissioners some leeway and provides that the number of votes shall be the same within 100 "as near as may be." This, we think, presents the most serious difficulty in connection with the redistricting as ordered by the commissioners. The object of the statute in requiring the same number of votes within 100 in each district is, of course, to give equality of representation to the voters subject to the provision that no single city, regardless of the number of votes, can have more than two of the county commissioners. Looking at the statute in question, we can see at least two possible reasons for the inclusion of the phrase "as near as may be" with reference to equality of votes within 100. Four-fifths of the population of a county might reside in one city therein. In that event,

the city might properly be divided into two commissioner districts and the remaining portion of the county into three, and manifestly the votes in each city district 'could exceed by much more than 100 the vote in any of the outlying districts. Also in thickly populated counties the requirement forbidding the division of any voting precinct might conceivably necessitate a difference of more than 100 in the voting population of districts. Neither of those situations is present in the instant case, however. The total vote of the county was only 4,107; the voting precincts are small; and it seems that it would not be unduly difficult to establish five districts in such manner that the voting population of each would be the same within 100. We incline to think that this should be done in order to comply with the statute. The reasons set out for not so doing in the resolution of the county commissioners and in the answer of appellant might very properly be urged upon the attention of the Legislature in seeking an amendment of the redistricting statute, but we doubt if they furnish justification to the county commissioners for failing to comply with the statute in its present form or for giving to 425 voters in district No. 5 the same voice in county affairs that is permitted to 986 voters in district No. 3 or to 972 voters in district No. 2.

We do not think it can be said that appellant acted arbitrarily or capriciously in refusing to take the appeal requested, nor is any charge of fraud or bad motive of any kind made either against the county commissioners or the appellant. When request was made for the taking of the appeal, appellant gave the matter his very prompt, careful, and full consideration, and immediately advised respondents of his position, setting forth his view and his reasons therefor. In view of our statutory provision, however, we think it must be said that the best interests of the county require an appeal where the statutory requirement for equivalence of votes within 100 is disregarded to the extent that one commissioner district is established with less than half the voting population of three of the other districts. And we think appellant abused the discretion vested in him to this extent and in this respect, that in exercising such discretion he permitted himself to be guided by an erroneous view of the law and by an opinion that, as a matter of law, it was permissible for the commissioners, in their discretion and under

the circumstances of this case, to disregard the statutory provision for equivalent voting population to the extent that they did disregard it.

Upon the entire record we arrive at the conclusion, therefore, that the judgment appealed from should be affirmed.

All the Judges concur.